IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Cabrini-Green Local Advisory Council, *et al.* | ) ) ) | No. 04 C 3792 |
| Plaintiffs, | ) ) | |
| | ) ) | The Honorable William J. Hibbler |
| v. | ) ) ) | |
| Chicago Housing Authority, *et al.* | ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OPINION AND ORDER

On June 4, 2004, the Cabrini-Green Local Advisory Council (LAC) sued the Chicago Housing Authority (CHA) alleging the CHA violated various state and federal fair housing laws. On December 3, 2007, the LAC moved for summary judgment asserting that the CHA's refusal to negotiate in good faith violated the parties' Relocation Rights Contract. For the reasons set forth below, the LAC's motion for summary judgment is GRANTED.

I.  Factual Background

A.  *The Parties*

*Cabrini-Green and The LAC*

Cabrini-Green is a low-income public housing development located on Chicago's near North side. *See* Chicago Housing Authority, *Cabrini-Green Homes*, http://www.thecha.org/housingdev/cabrini_green_homes.html (last visited May 30, 2008). Four separate sub-developments constitute Cabrini-Green: the William Green

1

Homes, Cabrini Extension North, Cabrini Extension South and the Cabrini-Green Row Houses. (Pl. 56.1(a) St. ¶ 26.) The Cabrini-Green Local Advisory Council is the tenant organization that represents the residents of Cabrini-Green. (Pl. 56.1(a) St. ¶ 1.) The LAC's membership is composed of lessees and authorized residents 18 years of age or older residing in Cabrini-Green. (Pl. 56.1(a) St. ¶ 2.) The LAC's board includes elected representatives from each building, area or block in the Cabrini-Green development. (Pl. 56.1(a) St. ¶ 3.) According to its bylaws, the purpose of the LAC is to: act on behalf of the residents of Cabrini-Green; engage in activities that will promote the educational, cultural and economic welfare of the residents; and to negotiate and execute contracts on behalf of the residents. (Pl. 56.1(a) St. ¶ 4.)

*The Residents*

Louise Gates, Yvonne Clay, Veronica Campbell, Sarah Haynes, Anthony Common, Shirley Thomas, Ramona Lee, and Veronica Marshall were all residents of Cabrini-Green when this lawsuit was initiated. (Pl. 56.1(a) St. ¶¶ 7-14.)

*The Chicago Housing Authority*

The United States Department of Housing and Urban Development provides funding to public agencies for the construction and operation of low-income housing. *42 U.S.C. § 1437c.* The influx of federal money allows these agencies to maintain and operate low-income residences while still charging below-market rent.[1] *42 U.S.C. § 1437a.* In exchange for monetary assistance, the public housing agencies must comply

---

[1] In general, families are expected to pay the highest of the following amounts:
(A) 30 per centum of the family's monthly adjusted income;
(B) 10 per centum of the family's monthly income; or
(C) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated. *42 U.S.C. § 1437a*

2

with all federal regulations promulgated by HUD. *Thomas v. Chicago Housing Authority et. al.*, 919, F.Supp. 1159, 1163 (N.D. Ill. 1996). The Chicago Housing Authority is the "public housing agency with jurisdiction over the City of Chicago, managing all public housing in Chicago." *Id.* Accordingly, the management and upkeep of Cabrini-Green is the responsibility of the CHA.

B.  *Historical Background*

In 1966, a group of African-Americans sued the Chicago Housing Authority alleging the CHA's housing policies fostered racial segregation. *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907, 908 (N.D. Ill. 1969). At the time, the CHA refused to assign African-Americans to public housing in white neighborhoods. *Id.* The CHA claimed its policy was necessary because white tenants would react violently to having African-American neighbors. *Id.* at 909. The district court rejected this argument and noted that while Chicago was not immune from racial conflict, the "history of tension, threats of violence and violence urged in justification by CHA cannot excuse a governmentally established policy of racial segregation." *Id.* Moreover, in the ten years preceding the case there were only two recorded incidents of violence related to African-Americans moving into "white projects." *Id.* at 910.

By 1969, 90% of the families on the waiting list for public housing were African-American. *Id.* at 909. Thus, the CHA recognized that if new projects were built, a majority of the tenants would be African-American. To maintain the existing residential segregation, the CHA refused to build public housing in white neighborhoods and instead built almost all of its low-income housing in African-American communities.[2] The court

---

[2] The CHA did not develop its segregation policy in a vacuum. For example, in 1965 the CHA declined to propose to the City Council seven possible building sites in white neighborhoods because "the alderman in

3

acknowledged that building low-cost housing anywhere is praiseworthy, but "a deliberate policy to separate the races cannot be justified by the good intentions with which other laudable goals are pursued." *Id.* at 914.

After finding that the CHA's policies ran afoul of the Constitution, the court issued an injunction ordering the CHA to "affirmatively administer its public housing system in every respect ... to the end of disestablishing the segregated public housing system which has resulted from CHA's unconstitutional site selection and tenant assignment procedures." *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736, 741 (N.D. Ill. 1969). The court divided Cook County into "Limited Areas" (defined as having an African-American population of 30% or more) and "General Areas" (defined as the rest of Cook County) and required the CHA to build one unit of public housing in a General Area for every unit of public housing erected in a Limited Area. *Gautreaux v. Chicago Housing Authority*, 178 F.3d 951, 953 (7th Cir. 1999). This remedial integration plan was known as "scattered site housing" and was intended to integrate low-income families into diverse neighborhoods as opposed to funneling them into designated black ghettos.[3]

For the next 18 years, the CHA struggled to develop adequate scattered site housing. Although some progress was made, the court determined that the project needed new leadership. In 1987 the court appointed a Receiver (the Habitat Company) and assigned it the responsibility of overseeing all of the CHA's construction projects

---

whose Wards those sites were located advised of community opposition and indicated they were opposed to such sites in their wards." *Gautreaux*, 206 F.Supp. at 911.

[3] Scholars have argued that concentrating poor residents in congested areas such as high-rise projects only exacerbates the problems attendant with poverty *e.g.*, crime, drug use, and illiteracy. *See* A. Dan Tarlock, *Remedying the Irremediable: The Lessons of Gautreaux*, 64 Chi-Kent. L. Rev. 573, 580 (1988).

4

related to scattered site housing. *Gautreaux*, 178 F.3d at 953. To this day, the receivership order remains in force.

C.  ***Demolition Plans and The Relocation Rights Contract***

In February 2000, the U.S. Department of Housing approved the CHA's plan to rehabilitate or newly construct 25,000 units of public housing. (Pl. 56.1(a) St. ¶ 17.) The CHA's plan calls for the demolition of approximately 22,000 units and the relocation of 24,000 families. (Pl. 56.1(a) St. ¶¶ 18-19.) HUD's approval of the plan, however, was contingent on the CHA adopting a "legally enforceable lease amendment affirming residents' rights under the relocation process, and containing other protections regarding tenant rights." *Resident Protection Agreement between CHA and HUD*, Plaintiffs' Exhibit 2 (Part. II B.1). Thus, the CHA signed a Leaseholder Housing Choice and Relocation Rights Contract with the Central Advisory Council, the authority-wide organization that represents all residents in CHA developments. (Pl. 56.1(a) St. ¶ 20.)

The stated purpose of the Relocation Rights Contract (RRC) was to inform public housing residents of their rights during the relocation process. (Pl. 56.1(a) St. ¶ 22.) The RRC states:

> Prior to relocating any Leaseholder, the CHA shall:
>
> ...
>
> (b) As part of the redevelopment process, [CHA] shall enter into a Redevelopment Agreement that may include terms that affect the relocation process for the development. The Redevelopment Agreement will address site specific relocation issues not covered in this Contract. If there is no Redevelopment Agreement, this Contract represents the applicable rights and procedures for the relocating process. **The CHA will make a good faith effort to enter into a [Memorandum of Agreement] with the LAC that reflects any property specific understandings with respect to the redevelopment process.**

5

(Pl. 56.1(a) St. ¶ 23.) (emphasis added).

On April 20, 2004, the CHA distributed relocation letters to approximately 385 families in Cabrini-Green: "This letter is notice that the CHA is planning to demolish the building where you live." (Ex. A to Complaint). The residents were given 180 days to relocate.[4] *Id.* On June 3, 2004, the LAC sued the CHA and alleged the proposed relocation plan violated the tenants' rights. On December 3, 2007, the LAC moved for summary judgment on Count VIII of its complaint.

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and that judgment as a matter of law should be granted in their favor. *Celotex, 477 U.S. 324*. Once the moving party has met the initial burden, the nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County*, Ill., 424 F.3d 659, 667 (7th Cir. 2005). The nonmoving party must produce specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Finally, all evidence

---

[4] On June 30, 2004, the LAC was granted a temporary restraining order halting certain aspects of the relocation process. On July 19, 2004, the LAC's motion to extend the temporary restraining order was withdrawn based on the CHA's agreement to maintain the status quo.

and inferences must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

### III. Analysis

Count VIII of the LAC's complaint asserts the CHA violated the Relocation Rights Contract by failing to negotiate, in good faith, a Memorandum of Agreement (MOA) regarding resident relocation. According to the LAC, not only does the plain language of the RRC require good faith negotiations, but having an MOA will facilitate the orderly and safe relocation of the families living in Cabrini-Green.

The CHA proffers four arguments against the motion for summary judgment: (1) The CHA has no authority to negotiate an MOA because the receivership order is still in effect; (2) The RRC does not require the CHA to negotiate bilaterally with the LAC; (3) Even if the CHA were required to negotiate with the LAC, there is a question of fact as to whether good faith negotiations occurred and; (4) The case is moot. As the court will explain, all four arguments are without merit.

*A.   The CHA has the Authority to Negotiate with the LAC Regarding Relocation*

In 1987, the district court placed a Receiver in charge of the scattered site housing program. The CHA now claims it no longer has the authority to negotiate contracts with the LAC. The CHA cites two district court rulings to demonstrate its supposed powerlessness; *Gautreaux v. CHA*, No. 66 C 1459 (N.D. Ill. Aug. 12, 1998) (Def. Ex. A-2) and *Gautreaux v. CHA*, No. 66 C 1459 (N.D. Ill. Sept. 28, 1999) (Def. Ex. A-4). The CHA's reliance on these two rulings is misplaced.

In 1998, the local media reported that the CHA had reached an agreement with the LAC concerning the development of Cabrini-Green. (Def. Ex. A-2). The Receiver

7

argued the agreement was void because the CHA had no power to build scattered site housing. The court agreed:

> [The] CHA lacks the authority to unilaterally negotiate *any* contract or agreement respecting the <u>**construction of housing**</u>, for the receivership order provides that the scattered site program includes all non-elderly housing.

*Id.* (emphasis added in underlined text). Accordingly, the court enjoined the CHA from negotiating or otherwise pursuing any agreement with any person or entity regarding the "development of dwelling units at Cabrini-Green." *Id.* The CHA characterizes the order as proof that it is prohibited from negotiating with the LAC. The court's ruling, however, was concerned with contracts regarding the "construction of housing" and the "development of dwelling units." Those issues are not present in this case. Here, the LAC only seeks to negotiate how families will be relocated; not when, where or how replacement housing will be constructed.

The CHA also relies on this court's September 28, 1999 ruling. There, the court rejected the argument that a private company chosen by the LAC (as opposed to the Receiver) should be allowed to "oversee and manage all construction of new and replacement housing at Cabrini-Green." *Gautreaux v. CHA*, No. 66 C 1459 (N.D. Ill. Sept. 28, 1999 (Def. Ex. A-4). The court held that allowing the LAC to submit an alternate plan regarding construction would usurp the powers delegated to the Receiver. *Id.* But to reiterate, here the LAC is not concerned with the construction of new units, but rather how families living in *existing* units will be relocated. The LAC has learned its lesson and asserts that any proposed MOA will "purposely avoi[d] any agreements regarding the construction of replacement housing." (Pl. Reply Mem. at 11).

Finally, the Court notes that on July 28, 2005, the General Counsel of the CHA and the President of the LAC entered into an interim Memorandum of Agreement regarding the relocation of residents from two buildings at the William Green Homes. (Pl. Supp. Ex. 12). Thus, it is quite disingenuous for the CHA to now claim they have no authority to enter into a similar MOA.

### B. *The Relocation Rights Contract Requires the CHA to Negotiate with the LAC*

The CHA is not precluded by the receivership order from bargaining with the LAC regarding relocation. Thus, the next question is whether the CHA is under any obligation to do so. Paragraph 5(b) of the Relocation Rights Contract states: "The CHA will make a good faith effort to enter into a [Memorandum of Agreement] with the LAC that reflects any *property specific understandings* with respect to the redevelopment process." (emphasis added). The RRC does not define the term "property specific understandings." But, the RRC defines the term "property specific requirements" in Paragraph 1(i):

> *property specific requirements* include but are not limited to: criteria for admission, return to the property, requirements for continued occupancy, time periods and activities for meeting for or curing a failure to meet such requirements and documentation to establish or verify compliance with such requirements. Such requirements *are to be developed by the working group* engaged in the planning process for a property.

(Pl. Ex. 4) (emphasis added)

The CHA argues it is not obligated to negotiate bilaterally with the LAC because: "property specific requirements" must be negotiated in a working group that includes lawyers, aldermen, developers, residents, representatives of the City, and the Receiver; the term "property specific understandings" as used in Paragraph 5(b) and "property specific requirements" as used in Paragraph 1(i) are really one in the same; therefore any

9

issues related to "property specific understandings" *i.e.* relocation, must also be vetted through a working group as opposed to an agreement with the LAC. This is a creative argument, but the Court declines the invitation to deviate from its established principles of contractual interpretation.

If possible, every word in a contract should be accorded meaning and effect. *Bankers Life Co., v. Int'l Tel. & Tel. Corp.* 239 F.2d 621, 623 (7th Cir. 1956); Restatement (Second) of Contracts § 203(a) (1981) (courts should not adopt contractual interpretations that would render some provisions superfluous). Here, the CHA seeks to disregard the phrase "property specific *understandings*" and replace it with "property specific *requirements*." Although the CHA is only changing one word, the proposed substitution is enough to alter the meaning of the contract. According to the American Heritage Dictionary a "requirement" is an obligatory prerequisite while an "understanding" can be defined as covenant between opposing groups. American Heritage Dictionary 1482, 1877 (4th ed. 2000). Given that the two words are not synonyms, the Court must presume that the drafters did not intend the words to be used interchangeably.

The RRC calls for "property specific understandings" to be established via Memorandum of Agreement, while "property specific requirements" must be put through a working group. Any "property specific understanding" *i.e.* covenant between opposing groups, will only bind the named parties. Therefore, Paragraph 5(b) *specifically names* the LAC as the party with whom negotiations must take place. Alternatively, "property specific requirements" are "prerequisites" that must decided as a threshold matter before negotiations can take place. Thus, it makes sense for the initial parameters of the

10

redevelopment process to be discussed in the larger work-group setting, while the specific MOA (which is only binding on the named signatories) is to be negotiated bilaterally.

This interpretation comports nicely with the structure of the RRC. The section concerning "property specific requirements" is in Paragraph 1 – pg. 84, while the section concerning "property specific understandings" does not appear until Paragraph 5 – pg. 91. If relocation issues were negotiated by the working group, it would be illogical for the drafters to force the CHA to make a good faith effort to *re-negotiate* these same issues in a separate MOA as called for in Paragraph 5. It seems much more likely that relocation issues were intended to be negotiated after the working group laid down an initial roadmap as contemplated in Paragraph 1. Additionally, Paragraph 1(i) lists the topics that fall under the purview of "property specific requirements" and there is no mention of relocation. By contrast, Paragraph 5(b) (which includes the term "property specific understandings") specifically addresses the issue of resident relocation:

> If there is no Redevelopment Agreement, then this Contract represents the applicable rights and procedures for the *relocation process*. The CHA will make a good faith effort to enter into a MOA with the LAC that reflects any property specific understandings with respect to the redevelopment process.

(Pl. Ex. 4) (emphasis added).

To reiterate, courts should construe contracts to give force to every provision. For example, in *Carroll v. Acme Cleveland Corp.*, the court analyzed a stock-purchase agreement and rejected Acme's argument that the terms "threatened claim" and "warranty claim" were synonyms:

> Acme's interpretation that the term "threatened claim" includes any possible warranty claim is implausible because the Agreement also refers to "warranty claims." Under Acme's interpretations both phrases would have the same

11

meaning ... this interpretation would render the term "threatened" redundant and would violate the principle of contract interpretation which requires courts to construe terms so as to avoid rendering other terms redundant or meaningless.

955 F.2d 1107, 1112 (7th Cir. 1992). Here, as in *Carroll*, the Court rejects the assertion that two similar yet distinct contractual terms ("property specific understandings" and "property specific requirements") should be given the same meaning. Adopting the CHA's interpretation would transform Paragraph 5(b) into a wholly illusory provision – this the Court will not do. *See, e.g., Utility Audit v. Horace Mann Serv. Corp.*, 383, F.3d 683, 688 (7th Cir. 2004) (rejecting interpretation where it would "render meaningless" another provision in the contract); *Brinderson –Newberg Joint Venture v. Pacific Erectors*, 971 F.2d 272 (9th Cir. 1992) (indicating that litigant's assertion "violates a fundamental rule of contract interpretations because it would render other portions of the contract meaningless").

C.  *Good Faith Negotiations Have Not Occurred*

The plain language of the Relocation Rights Contract requires the CHA to negotiate in good faith with the LAC. The CHA contends there is a question of fact as to whether it complied with its obligations. The court disagrees. In *U.S. v. Greyhound Corp.*, the Seventh Circuit noted that good faith negotiations require: "active participation in the deliberations, a sincere effort to overcome the obstacles or differences between the parties, and a duty to respond to a good faith proposal put forth by the other party." 508 F.2d 529, 536 (7th Cir. 1974). The CHA's position was and continues to be that it will not sign an MOA between itself and the LAC. (Pl. Ex. 10 at 1.) Astoundingly, the CHA categorizes its stance as consistent with its contractual obligations: "[the] CHA's refusal to enter into an MOA without the other interested parties is a good faith position." (Def.

Resp. Br. at 15). This argument is irreconcilable with the Relocation Rights Contract which expressly calls for a bilateral agreement: *"**The CHA will make a good faith effort to enter into a [Memorandum of Agreement] with the LAC ...**"* The Court is puzzled as to why the CHA refuses to sign an agreement without the other "interested parties" when the only interested parties named in Paragraph 5(b) are the CHA and the LAC.

In a prior decision, Judge Kennelly noted that "determination of the precise contours of the duty to negotiate in good faith is complicated by the fact that there is precious little Illinois law on the subject." *JamSports & Entm't, LLC v. Paradama Prods.*, 336 F. Supp. 2d 824, 848 (N.D. Ill. 2004). Indeed, in some instances it will be difficult to determine the difference between driving a hard bargain (which is completely permissible) and acting in bad faith. But, this is not one of those cases. Here, the CHA has informed the LAC that regardless of the terms of its suggested proposal and despite an express provision calling for good faith negotiations, there will never be an exclusive agreement between the parties. This is not good faith negotiation.

A breach of the duty to negotiate in good faith occurs where one side unreasonably insists on conditions that are beyond the scope of the preliminary agreement. *A/S Apothekernes Laboratorium v. I.M.C. Chem. Group Inc.*, 873 F.2d 155, 158 (7th Cir. 1989); 1 E. Farnsworth, Farnsworth on Contracts § 3.26, (3d. ed. 2004) (negotiating in bad faith occurs when "one party refuses to negotiate except on conditions that it cannot properly impose"). Here, the Relocation Rights Contract demands bilateral negotiations between the CHA and the LAC. Yet, the CHA admits it seeks to impose a multilateral component on the bargaining process. To be sure, the duty to negotiate in good faith does not require the CHA to ultimately sign an agreement. *Apothekernes*, 873

F.2d at 159. But, a refusal to negotiate unless the opposing side disregards the original terms of the contract is not good faith.

For example, in *Milex Prods v. Alra Labs. Inc.*, the parties had a preliminary agreement regarding the manufacture of an ovulation drug. 237 Ill. App. 3d 177, 179, 603 N.E. 2d 1226, 1228 (Ill. App. Ct. 1992). Although the parties agreed to negotiate in good faith, the deal broke down when the defendant insisted on being allowed to market the drug to the plaintiff's competitors and demanded that the plaintiff secure it an insurance policy. *Id.* The court began its analysis by noting that good faith does "not prohibit a party from bargaining to its own economic advantage." *Id.* at 190. A party that insists on conditions not contemplated by the initial agreement, however, violates the duty to negotiate in good faith: "with [the plaintiff] "locked in to [the defendant] as the manufacturer, [the defendant] tried to take advantage of the situation to force [the plaintiff] to accept terms that had not been contemplated in the original contract ..." *Id.* at 190.

Similarly, the LAC is "locked in" to dealing with the Chicago Housing Authority. As noted above, the CHA is the "public housing agency with jurisdiction over the City of Chicago, managing *all public housing in Chicago.*" *Thomas,* 919 F. Supp. at 1163 (emphasis added). The CHA's demolition plan was approved by HUD with the "express condition" that the CHA implement a "legally enforceable lease amendment affirming residents' rights under the relocation process" *i.e.,* the Relocation Rights Contract. *Resident Protection Agreement between CHA and HUD,* Plaintiffs' Exhibit 2 (Part. II B.1). The Relocation Rights Contract calls for bilateral negotiations between the CHA and the LAC. Now, with HUD approval in its back pocket, the CHA demands that the

language of the contract be disregarded before it will consider signing an agreement – this is contrary to the duty of good faith.

The Court recognizes that an agreement between the CHA and the LAC could impact the interests of key third parties. Indeed, the CHA cites this as a reason for its reluctance to engage in earnest negotiations. If this is the CHA's concern, then the remedy is to sit at the bargaining table with the interests of these third parties in mind, not completely disregard the duty to negotiate in good faith. It bears repeating, the CHA is not obligated to sign a Memorandum of Agreement with the LAC. But, agreeing to negotiate in good faith requires that the parties at least be willing to consider signing reasonable proposals, even though each side is ultimately free to reject any proposal that falls short of the party's stated or unstated pecuniary, political or personal preferences.

### D. This Case is not Moot

According to the CHA, this case is moot because the plaintiffs were ultimately allowed to stay at Cabrini-Green until they found new housing. By contrast, the LAC argues that the underlying controversy – whether the parties must negotiate in good faith towards a relocation plan – is still present. A case is considered moot when the issues presented are no longer "live" and there is no reasonable expectation that the challenged action will be repeated. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). If there were no buildings slated to be razed and no tenants slated for relocation, the CHA would have a stronger argument for mootness, but that is not the case.

The CHA's Annual Plan asserts its goal for 2008 is to demolish 670 units of housing at Cabrini-Green. (Pl. 56.1(a) St. ¶¶ 28-30.) The CHA has slated 325 units for demolition in 2009. (*Id.*) The CHA does not expect replacement housing to be

15

constructed until 2012 for the Green Homes and 2014 for Cabrini Extension South. (*Id.*) Despite this schedule, the parties have yet to memorialize an agreement regarding the relocation process. The LAC is the tenant organization that represents the remaining residents of Cabrini-Green. If this case were disposed of as moot, the Court expects that the same issues and arguments would be raised promptly in a new lawsuit with the only difference being new residents in the case caption. Accordingly, the Court finds that the controversy is live, capable of repetition and thus deserving of adjudication. *See, e.g., Herring v. Chicago Hous. Auth.*, 850 F. Supp. 694, 699 (N.D. Ill. 1994) (finding that the CHA's withdrawal of its threat to evict the plaintiff from public housing did not moot the underlying case); *Davis v. Village Park II Realty Co.*, 578 F.2d 461, 463 (2nd Cir. 1978) (determining that a case is not moot where "defendants' allegedly wrongful conduct required the plaintiff to hire counsel to bring this action to prevent her eviction, and only after suit was brought did the defendants agree not to pursue the eviction proceedings").

## IV. CONCLUSION

Finally, the Court will briefly address the CHA's practical concerns. The CHA argues signing a legally enforceable Memorandum of Agreement would bog down the relocation process and lead to lengthy court battles. But as noted above, the CHA has already tried a unilateral approach to relocation and it spawned precisely what it wishes to avoid – protracted litigation. When the CHA issued relocation notices to the residents, the parties wasted no time in appearing before this Court to argue the wisdom and legality of the CHA's actions. If the parties were to sit down and negotiate an agreement outlining the standards and parameters for the relocation process, piecemeal litigation would be much less likely. The parties' briefs and supporting materials reveal that both

the CHA and the LAC have the same goal: ensuring that the families living in Cabrini-Green are relocated in an orderly, safe and dignified manner. The Court is confident that if both sides are willing to make concessions the parties will be able to reach a narrowly tailored agreement that focuses *solely* on relocation procedures while leaving all other construction and redevelopment issues to the pre-existing Working Group.

The LAC's Motion for Summary Judgment on Count VIII of the complaint is GRANTED.

IT IS SO ORDERED.

5/30/08
Dated

The Honorable William J. Hibbler
United States District Court